IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


ROBERT H. SPRUK,                     )
                                     )
               Plaintiff,            )
                                     )   CIVIL ACTION
v.                                   )
                                     )   No. 09-2200-JAR-GBC
                                     )
MICHAEL J. ASTRUE,                   )
Commissioner of Social Security,     )
                                     )
               Defendant.            )
_____  )


## REPORT AND RECOMMENDATION


Plaintiff seeks review of a decision of the Commissioner of
Social Security (hereinafter Commissioner) denying disability
insurance benefits (DIB) and supplemental security income (SSI)
under sections 216(i), 223, 1602, and 1614(a)(3)(A) of the Social
Security Act.  42 U.S.C. §§ 416(i), 423, 1381a, and
1382c(a)(3)(A) (hereinafter the Act).  Finding no error as
alleged in plaintiff's brief, the court recommends judgment be
entered in accordance with the fourth sentence of 42 U.S.C.
§ 405(g) AFFIRMING the Commissioner's decision.

## I.   Background

As the decision at issue states, it is the third hearing
decision issued on plaintiff's concurrent applications filed
December 7, 1998.  (R. 861).  The first hearing decision was
issued by Administrative Law Judge (ALJ) Gary E. Lowe on February

17, 2000, and the case was remanded by the Appeals Council for another hearing and a new decision on January 11, 2002. Id. at 52-65, 140-43, 861-62. While Appeals Council review was pending, on November 27, 2000, plaintiff submitted another set of applications, the claims were consolidated, proceedings were held before ALJ Susan B. Blaney, and she issued a second decision on April 29, 2004. Id. at 32-42, 861-62. Plaintiff's subsequent request for Appeals Council review was denied, and plaintiff sought judicial review in the District Court for the District of Kansas. Id. at 14-16, 862; Spruk v. Barnhart, No. 05-4098-SAC (D. Kan. Aug. 17, 2005)(Doc. 1). After preliminary proceedings, the district court granted the Commissioner's Motion to Remand pursuant to an Agreed Order on February 1, 2006, and the Appeals Council subsequently ordered remand for proceedings consistent with the court's order. Id. at 862, 892-901; Spruk, No. 05-4098-SAC, Agreed Order, (D. Kan. Feb. 1, 2006)(Doc. 16). On remand, additional records were received and ALJ Blaney held two additional hearings on July 20, 2007 and April 21, 2008. (R. 862-63, 1011-1739).

At both hearings plaintiff was represented by counsel. At the July 2007 hearing, testimony was taken from a medical expert, from plaintiff, and from a vocational expert. (R. 1640-1730). At this hearing, the ALJ became aware of additional medical records, she later determined the additional records were

-2-

extensive, and decided to hold a supplemental hearing.  (R. 926, 938).  A supplemental hearing was held on April 21, 2008.  (R. 1731-39).  At the supplemental hearing a vocational expert appeared, and plaintiff appeared through counsel and waived personal appearance and testimony.  (R. 1735).  At the supplemental hearing the additional evidence was admitted, a written statement from plaintiff was admitted, and counsel made a closing statement.  (R. 1735-39).  On July 25, 2008, the ALJ issued an unusually lengthy and thorough decision finding plaintiff not disabled within the meaning of the Act, and denying the applications for benefits.  (R. 861-91).

The Appeals Council did not assume jurisdiction of the decision after remand and the third ALJ decision, issued July 25, 2008, became the final decision of the Commissioner after remand. (R. 853); Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004); 20 C.F.R. §§ 404.984, 416.1484 (2008).  Plaintiff now seeks judicial review.

## II.  Legal Standard

The court's review is guided by the Act.  42 U.S.C. §§ 405(g), 1383(c)(3).  Section 405(g) provides, "The findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive."  The court must determine whether the factual findings are supported by substantial evidence in the record and whether the ALJ applied the correct legal standard.

Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007); White v. Barnhart, 287 F.3d 903, 905 (10th Cir. 2001). Substantial evidence is more than a scintilla, but less than a preponderance, it is such evidence as a reasonable mind might accept to support a conclusion. Zoltanski v. F.A.A., 372 F.3d 1195, 1200 (10th Cir. 2004); Gossett v. Bowen, 862 F.2d 802, 804 (10th Cir. 1988). The court may "neither reweigh the evidence nor substitute [it's] judgment for that of the agency." White, 287 F.3d at 905 (quoting Casias v. Sec'y of Health & Human Serv., 933 F.2d 799, 800 (10th Cir. 1991)); Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005). The determination of whether substantial evidence supports the Commissioner's decision, however, is not simply a quantitative exercise, for evidence is not substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion. Gossett, 862 F.2d at 804-05; Ray v. Bowen, 865 F.2d 222, 224 (10th Cir. 1989).

An individual is under a disability only if that individual can establish that he has a physical or mental impairment which prevents him from engaging in substantial gainful activity and is expected to result in death or to last for a continuous period of at least twelve months. 42 U.S.C. § 423(d). The claimant's impairments must be of such severity that he is not only unable to perform his past relevant work, but cannot engage in any other substantial gainful work existing in the national economy. Id.

The Commissioner has established a five-step sequential process to evaluate whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920; Allen v. Barnhart, 357 F.3d 1140, 1142 (10th Cir. 2004); Ray, 865 F.2d at 224. "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

In the first three steps, the Commissioner determines whether claimant has engaged in substantial gainful activity, whether he has severe impairments, and whether the severity of his impairments meets or equals the severity of any impairment in the Listing of Impairments (20 C.F.R., Pt. 404, Subpt. P, App. 1). Id. at 750-51. If claimant's impairments do no meet or equal the severity of a listing, the Commissioner assesses claimant's residual functional capacity (RFC). 20 C.F.R. §§ 404.1520, 416.920. This assessment is used at both step four and step five of the process. Id.

After assessing claimant's RFC, the Commissioner evaluates steps four and five--whether the claimant can perform his past relevant work, and whether he is able to perform other work in the national economy. Williams, 844 F.2d at 751. In steps one through four the burden is on claimant to prove a disability that prevents performance of past relevant work. Dikeman v. Halter, 245 F.3d 1182, 1184 (10th Cir. 2001); Williams, 844 F.2d at 751

-5-

n.2.  At step five, the burden shifts to the Commissioner to show

other jobs in the national economy within claimant's capacity.

Id.; Haddock v. Apfel, 196 F.3d 1084, 1088 (10th Cir. 1999).

## III. Discussion

Plaintiff's only claim of error is that the ALJ failed to

properly consider the reports of examination completed by

psychological consultant, Dr. Bruce Bean.  (Pl. Br. 7-12).

Specifically, he claims that in disregarding Dr. Bean's opinion,

the ALJ improperly relied upon her own lay opinion that Dr.

Bean's opinion was based only on plaintiff's subjective

complaints.  Id. at 8-11(citing Langley v. Barnhart, 373 F.3d

1116, 1123 (10th Cir. 2004); Robinson v. Barnhart, 366 F.3d 1078,

1083 (10th Cir. 2004); McGoffin v. Barnhart, 288 F.3d 1248, 1252

(10th Cir. 2002); Smith v. Astrue, No. 08-4050-JAR, 2009 WL

975144 *7 (D. Kan. Apr. 9, 2009); and Boucher v. Astrue, No. 08-

1070-JTM, 2009 WL 737156 *5 (D. Kan. Mar. 20, 2009)).  The

Commissioner argued that the ALJ properly considered Dr. Bean's

opinion.  (Comm'r Br. 6-15).  The Commissioner summarized his

argument:

> Dr. Bean was not a treating source.  He provided
> reports of two consultative examinations.  His opinions
> obviously were based in part on Plaintiff's
> presentation and behavior which Dr. Swearngin, a
> treating physician, had found to be exaggerated and
> playing for sympathy based upon behavior recorded on
> camera.  The ALJ found Plaintiff's allegations not to
> be credible and Plaintiff does not argue otherwise.
> Dr. Bean's assessments were internally inconsistent,
> were not retroactive, and were inconsistent with other

-6-

substantial evidence in the record.  The ALJ's
consideration of Dr. Bean's reports was not based on
speculation.

Id. at 15.  In a broad sense, the court agrees with the

Commissioner's argument.

### A.    Standard for Evaluating Medical Opinions

"Medical opinions" are defined as "statements from

physicians and psychologists . . . that reflect judgments about

the nature and severity of [claimant's] impairment(s), including

[claimant's] symptoms, diagnosis and prognosis, what [claimant]

can still do despite impairment(s), and [claimant's] physical or

mental restrictions."  20 C.F.R. §§ 404.1527(a)(2),

416.927(a)(2).  Opinions from any medical source must not be

ignored, and when the Commissioner does not give controlling

weight to a treating physician's opinion, all medical opinions

will be evaluated by the Commissioner in accordance with factors

contained in the regulations.  Id. at §§ 404.1527(d), 416.927(d);

Soc. Sec. Rul. (SSR) 96-5p, West's Soc. Sec. Reporting Serv.,

Rulings 123-24 (Supp. 2009).

Medical opinions are generally accorded relative weight

based upon the claimant's relationship to the medical source[1]

---

[1]The regulations define three types of medical sources:
"Treating source:"  a medical source who has provided the
claimant with medical treatment or evaluation in an ongoing
treatment relationship.  20 C.F.R. §§ 404.1502, 416.902.
"Nontreating source:"  a medical source who has examined the
claimant, but never had a treatment relationship.  Id.
"Nonexamining source:"  a medical source who has not

-7-

offering the opinion.  A physician who has treated a patient
frequently over an extended period of time (a treating source) is
expected to have greater insight into the patient's medical
condition and his opinion may, in appropriate circumstances, be
accorded controlling weight.  Doyal v. Barnhart, 331 F.3d 758,
762 (10th Cir. 2003).  Even when not accorded controlling weight,
a treating source opinion is worthy of deference.  Watkins v.
Barnhart, 350 F.3d 1297, 1300-01 (10th Cir. 2003).  But, "the
opinion of an examining physician [(a nontreating source)] who
only saw the claimant once is not entitled to the sort of
deferential treatment accorded to a treating physician's
opinion."  Doyal, 331 F.3d at 763 (citing Reid v. Chater, 71 F.3d
372, 374 (10th Cir. 1995)).  However, opinions of nontreating
sources are generally given more weight than the opinions of
nonexamining sources who have merely reviewed the medical record.
Robinson, 366 F.3d at 1084; Talbot v. Heckler, 814 F.2d 1456,
1463 (10th Cir. 1987).

### B.  The ALJ's Medical Opinion Findings

The ALJ provided an unusually extensive and thorough (at
twelve single-spaced pages in the thirty-one page decision)
"Summary of Medical Treatment & Examinations."  (R. 863-74).
With regard to plaintiff's mental impairments, the ALJ noted the
plaintiff's primary care physician, Dr. Bremby, had diagnosed

---

examined the claimant, but provides a medical opinion.  Id.

plaintiff with anxiety and depression, and in 2003 referred
plaintiff for a psychological evaluation at Bert Nash Community
Mental Health Center.  (R. 867).  She discussed Dr. Hughes's
primary care treatment in 2004 and 2005 and his diagnoses of
anxiety and depression.  (R. 868-69).  She noted Dr. Huet-Vaughn
became plaintiff's primary care physician in 2005 through 2007,
and also diagnosed anxiety and depression.  (R. 870-73).  She
discussed reports of examinations by Dr. Bean in March 2006, and
March, 2007.  (R. 871, 873-74).  The ALJ summarized an emergency
room visit in which plaintiff complained of a nervous breakdown
after breaking up with his girlfriend in April 2006 (R. 872), and
treatment notes from Dr. Swearngin[2] for psychological counseling
from May 2006 through February 2007.  (R. 872-73).

     The ALJ found that plaintiff has dysthymic disorder and
personality disorder with dependant and borderline features.  (R.
876).  In that regard, the ALJ specifically discussed the
examination reports of Dr. Bean, the treatment records of Dr.
Swearngin, and the Psychiatric Review Technique and Mental RFC
forms completed by the state agency psychologists, and determined
that plaintiff has no restriction of activities of daily living,
no episodes of decompensation, moderate limitations in
maintaining social functioning, and mild limitations in

_____

     [2]As the Commissioner notes, the ALJ referred to Dr.
Swearngin as "Dr. Swearingen" throughout the decision.  (Comm'r
Br. 10, n.6).

maintaining concentration, persistence, or pace.  (R. 876-78).

She concluded plaintiff's mental impairments do not meet or

medically equal a Listed Impairment.  (R. 879).

In relevant part, the court includes the ALJ's summary and

analysis regarding the treatment and opinions of Dr. Bean and Dr.

Swearngin:

> On March 23, 2006, Bruce Bean, Ph.D., consultatively
> examined the claimant for psychological disability.
> The claimant reported he was unemployed and lived with
> his mother.  He smoked one-half pack per day.  Dr. Bean
> observed he "walks very slowly in a slightly stooped
> forward[3]," carrying his right hand in a guarded
> position close to his body.  He spoke "quite slowly in
> a notably monotone voice."  Dr. Bean's multi-axial
> diagnosis was:  (I) Depressive disorder - probable
> Major Depressive Disorder, Recurrent, Mild to Moderate,
> and somewhat improved with medications; also, some mild
> reported anxieties; (II) Cognitive functioning in the
> low average range, with Passive Dependent Personality
> Style; (III) Multiple medical problems;
> (IV) Psychosocial stressors include multiple medical
> difficulties by report, financial concerns, ongoing
> grief and loss issues regarding loss of father, and
> concern about his current limitations in function;
> (V) GAF 40 to 50.  Dr. Bean concluded the claimant's
> "potential for competitive employment would be
> negatively impacted by his current difficulties," most
> notably "his very low pace of function in terms of
> movement as well as thought and speech."  (Exh. 50F.)

(R. 871).

> Additionally, evidence received after the July 20, 2007
> hearing held by the undersigned Administrative Law
> Judge shows that, starting with an initial interview on
> May 10, 2006, the claimant continued through 2006 with
> psychological counseling by Sheila Swearingen, Ph.D.
> Dr. Swearingen's notes show the claimant initially

_____

[3]The ALJ mistakenly omitted the word "position" from this
quotation.  (R. 1459).

"presented for evaluation during his girlfriend's scheduled appointment. He walked with slow, shuffling gait, and spoke with tremulous voice." The claimant's goal was to convince [his girlfriend], with whom he had been in a 12-year relationship and called his common-law wife, not to break up with him. For her part, [the girlfriend] "was certain of her decision and was not interested or willing to attend couple's counseling." The claimant:

> . . . expressed belief that if he hadn't left [his girlfriend]'s home when his father was ill two years ago, that the relationship would not be ending at this time. He states he is currently living with his mother, helping to finish what his father wanted done prior to his death. [He] indicates he has no close contact with family members, that everyone is angry and doesn't talk with him.

Dr. Swearingen's initial diagnostic impression was: (I) Dysthymic Disorder; and (II) Dependent Personality Disorder; Borderline Personality Disorder. On review of Dr. Swearingen's counseling records, the undersigned notes she observed the claimant presented on August 23 wearing "work uniform clothing." When she asked him if he had returned to work, he told her he "felt like pretending he had a job." That day, he also "was making statements about ways to finance his future work in painting," which he felt would make him less depressed. On October 6, he had

> . . . made decision to spend time in a trailer he has, indicating he had it towed to a field that belongs to a friend. He states he is able to have time to think on his own, and expressed hope that he could do some hunting as well, perhaps with [his girlfriend]'s son. He also discussed desire to try putting his motorcycle business together, but will give himself a time line to complete it, or give up and move on to a different idea.

On November 16, Dr. Swearingen noted he was walking "exceptionally slowly in the office," which deviated from his "walking behavior via camera monitors." Specifically, he "walked rather quickly from his

vehicle at far end of parking lot into building and then changed demeanor walking into waiting room." After the session, he "left office, again very slowly, to extent other people in hallway had trouble walking behind him . . . as he left the office suite he again was walking much quicker than in the presence of the therapist." She noted that she intended to "confront [his] attempted manipulation/malingering behavior." (Exh. 55F/3-7.)

* * *

In follow-up with Dr. Swearingen, the claimant no-showed for a January 16 appointment, and cancelled a January 22 appointment. (Exh. 55F/6.) The most recently dated treatment record in evidence is Dr. Swearingen's February 15, 2007 individual therapy note. The claimant presented "in anxious and depressed mood, reporting that he feels hopeless about his situation with [his girlfriend], and worried about living situation. He indicates his mother wants him to move out and he has no place to go." The claimant again was caught putting on an unusually impaired gait in the office, taking almost 10 minutes to walk from the office to the waiting room at the end of the session. Dr. Swearingen's observations about this conclude, "View from the [parking lot] camera appears to indicate he has no problems walking at a more "normal" pace [one step per second, to his vehicle] and that his slow, plodding shuffle in the office is exaggeration and playing for sympathy." (Exh. 55F/2.)

The claimant also had consultative physical and psychological evaluations in 2007 to develop his subsequent application. On March 12, 2007, Bruce Bean, Ph.D., again consultatively examined him for psychological disability. In view of Dr. Swearingen's observations, supra, one reasonably might conclude the claimant's personal presentation was contrived. Dr. Bean noted the claimant, who then was age 38, "walks slowly with a shuffling gait and in a slightly stooped-forward fashion, appearing very much like a little old man as he enters the office." Dr. Bean noted the claimant complained of lack of support from friends, [his girlfriend], and his immediate family members, all of whom "had lost patience with him and his medical difficulties, at least according to his report." Dr. Bean's multi-axial diagnostic impression

was:  (I) Depressive Disorder - probably Major
Depressive Disorder, Recurrent, Mild to Moderate, with
associated Anxiety Features; (II) Cognitive functioning
in the low average range, with notable Passive
Dependent Personality style; (III) Multiple medical
problems; (IV) Psychosocial stressors include ongoing
medical difficulties and limited access to medical care
and financial concerns, as well as deteriorating social
support system; (V) GAF 40.  The claimant provided Dr.
Bean with a list of 31 diagnoses and 14 medications,
which Dr. Bean attached to his report. (Exh. 56F.)

(R. 872-74).

Regarding mental impairment(s), at the July 2007
[hearing] Mr. Cox [plaintiff's counsel] stated the
claimant is not alleging disability solely due to
depression/anxiety but it enters into the overall
picture.  The undersigned notes that Dr. Swearingen is
the only mental health professional who developed a
treating relationship with the claimant.  Her office
records reflect that she saw him 19 times from May to
December 2006, and once in February 2007.  Her initial
diagnostic impression was:  (I) Dysthymic disorder;
(II) Dependent personality disorder; and Borderline
personality disorder.  Her final impression, after
comparing his behavior in the office to surveillance
videos of his more normal walking behavior outside the
office (on November 16, 2006 and again on February 15,
2007), was that his behavior was exaggerated and he was
"playing for sympathy."  (Exh. 55F.)  The undersigned
notes the claimant's gait was observed by a number of
examining professional sources both in and out of
treatment, from Dr. Fishman on April 26, 2001, who
noted he walked with a shuffling gait and exaggerated
antalgia, to Dr. Pickett on March 17, 2007, who
observed he walked with "a small stepped, ataxic gait."
(Exh. 57F.)  Dr. Dick, however, stated his "gait is
normal except for the decrease in lumbar lordosis," on
October 31, 2005.  (Exh.37F.)  Dr. Bean, who performed
"the consultative [psychological] exams at both 50F and
56F," referenced in Mr. Cox's closing remarks, noted on
March 12, 2007, that the claimant "walks slowly with a
shuffling gait and in a slightly stooped forward
fashion, appearing very much like a little old man as
he enters the office."  (Exh. 56F/2.)  The
Administrative Law Judge finds Dr. Bean's acceptance of
this behavior detracts from Dr. Bean's findings, which

-13-

appear to have been influenced by it.  Also, the
psychologist who evaluated the claimant on October 7,
2003, felt that only brief treatment was indicated, and
the claimant was not considered to be severely and
persistently mentally ill.  (Exh. 29F.)  It is noted
that the problem underlying both the claimant's
treatment by Dr. Swearingen, and his evaluation at Bert
Nash [on October 7, 2003], was his relationship with
[his girlfriend].  In weighing Dr. Swearingen's initial
diagnostic assessment, the undersigned observes her
notes indicate she had been counseling [plaintiff's
girlfriend], and her initial diagnostic assessment
therefore likely was informed beyond what she learned
at her first session with him.

(R. 877).

### C.  **Analysis**

The ALJ concluded that plaintiff's statements regarding "the
intensity, persistence and limiting effects of his alleged
symptoms are not credible."  (R. 879-80).  In making this
credibility determination, the ALJ gave considerable weight to
Dr. Swearngin's treatment notes and the opinions stated therein:

> The element of the claimant's mental impairment(s) is
> discussed at the third step of the sequential
> evaluation, above, with the critical fact being the
> conclusion of Dr. Swearingen (who by then knew the
> claimant quite well) that the claimant's pain behavior
> was "attempted manipulation/malingering" and
> "exaggeration and playing for sympathy."  Accepting
> this, as the undersigned does, it is unclear why other
> symptoms which equally may be feigned or exaggerated
> (e.g., fibromyalgia, migraine headaches, all over body
> pain, using a cane, etc.) should be given credence.

(R. 881).

As the Commissioner noted, plaintiff's brief does not allege
error in the ALJ's credibility finding, and the court accepts it
as unopposed.

-14-

In his primary allegation of error, and appealing to the decisions in McGoffin, Langley, Robinson, and Smith, plaintiff claims the ALJ improperly discounted the opinion of the non-treating examiner, Dr. Bean, because the opinion was based upon plaintiff's subjective complaints or behavior. Plaintiff acknowledges that McGoffin, Langley, and Robinson strictly apply only to the opinions of treating sources, but argues that the Smith decision broadened their application to any medical opinion, and that the rule is applicable to Dr. Bean's non-treating source opinion. He then argues there is no evidence in Dr. Bean's report that his opinion was based upon plaintiff's behavior or subjective complaints, and the ALJ's contrary finding improperly substituted her lay opinion for that of Dr. Bean.

As plaintiff's brief suggests, the Tenth Circuit has considered the standard for considering whether a treating physician's opinion is based upon subjective complaints or behaviors. "In choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical reports." McGoffin, 288 F.3d at 1252. Where the ALJ has no evidentiary basis for finding that a treating physician's opinion is based only on plaintiff's subjective complaints, his conclusion to that effect is merely speculation which falls within the prohibition of McGoffin. Langley, 373 F.3d at 1121. Such a conclusion (that a treating physician's opinion is based

only on subjective complaints) must be based upon evidence taken from the physician's records. <u>Victory v. Barnhart</u>, No. 03-7129, 2005 WL 273302 at *2-3, 121 Fed. Appx. 819, 823-24 (10th Cir. Feb. 4, 2005)(unpublished). The holding in <u>Robinson</u> is to a similar effect. <u>Robinson</u>, 366 F.3d at 1083(ALJ's finding that treating source opinion appeared to be based on plaintiff's refusal to comply with treatments was not supported by record evidence, doctor did not indicate plaintiff was refusing to comply).

Plaintiff argues that the rule of <u>McGoffin</u>, <u>Langley</u>, and <u>Robinson</u> was broadened in <u>Smith</u> to include medical sources who are not treating physicians. The Commissioner argues that although the nurse-practitioner at issue in <u>Smith</u> was not a physician, she was a treating provider, and <u>Smith</u> did not apply the rule to non-treating sources such as Dr. Bean in this case. As plaintiff argues, in <u>Smith</u> the court applied the rule of <u>McGoffin</u>, <u>Langley</u>, and <u>Victory</u> to an ALJ's finding that the opinion of a nurse-practitioner was based upon plaintiff's subjective complaints. <u>Smith</u>, 2009 WL 975144 at *7. As the Commissioner argues, although the nurse-practitioner in <u>Smith</u> was not a "treating source," she was an "other" medical source who had, in fact, treated Smith for nine months. <u>Id.</u> at *4.

Although the decisions in <u>McGoffin</u>, <u>Langley</u>, <u>Victory</u>, and <u>Robinson</u> specifically involved treating source opinions and the

decision in Smith involved the opinion of a treating medical
source, the court does not find those fact controlling in
determining whether the rule should be applied in this case.  It
is without dispute that an ALJ's findings must be supported by
substantial evidence in the administrative record.  E.g., Wall v.
Astrue, 561 F.3d 1048, 1052 (10th Cir. 2009); Lax, 489 F.3d at
1084; White, 287 F.3d at 905.  An administrative agency must give
reasons for its decisions.  Kepler v. Chater, 68 F.3d 387, 391
(10th Cir. 1995)(citing Reyes v. Bowen, 845 F.2d 242, 244 (10th
Cir. 1988)).  Where the ALJ's RFC determination conflicts with
any medical source opinion, the ALJ must explain why he did not
adopt the medical source opinion.  SSR 96-8p, West's Soc. Sec.
Reporting Serv. 150 (Supp. 2009).

Therefore, any time an ALJ discounts a medical source
opinion, she must state her reasons and the evidentiary basis for
her findings.  Thus, in this case, where the ALJ discounted Dr.
Bean's opinion because it appears to have been influenced by
plaintiff's behavior at Dr. Bean's examinations, she is required
to provide a rationale and explain the evidentiary basis for her
determination--she may not speculate.  That is all McGoffin,
Langley, Victory, Robinson, and Smith require.  As quoted above,
it is clear that the ALJ did so in this case.

The ALJ discounted Dr. Bean's opinion (1) because it was
inconsistent with the opinion of Dr. Swearngin, "the only mental

health professional who developed a treating relationship with the claimant;" (2) because Dr. Swearngin noted plaintiff's behavior was exaggerated and plaintiff was playing for sympathy; (3) because a number of treating and non-treating sources observed plaintiff's gait, and the observed gait was inconsistent between the observers; (4) because Dr. Bean accepted plaintiff's exaggerated behavior, and his opinion was influenced by that behavior; (5) and because the opinions of Dr. Swearngin and the psychologist at Bert Nash were consistent with each other and inconsistent with the opinion of Dr. Bean. (R. 877)(quoted supra at 13-14).

Plaintiff's argument that Dr. Bean's reports contain no evidence that he based his opinion on plaintiff's behavior or subjective complaints is not supported by a fair review of the record. Plaintiff does not argue that the ALJ's summary of Dr. Bean's examinations and reports is erroneous, and the court's review reveals that the summary included in the decision is a fair and accurate portrayal of the reports. With regard to the first report of examination, the ALJ noted Dr. Bean's observation that plaintiff

> "walks very slowly in a slightly stooped forward [position]," carrying his right hand in a guarded position close to his body. He spoke "quite slowly in a notably monotone voice."

(R. 871)(quoting Ex. 50F (R. 1459)). She noted Dr. Bean's conclusion that plaintiff's

> "potential for competitive employment would be
> negatively impacted by his current difficulties," most
> notably "his very low pace of function in terms of
> movement as well as thought and speech."

Id.(quoting Ex. 50F (R. 1461)).  The ALJ's quotation and summary

of the report is accurate.  As the ALJ pointed out Dr. Bean

stated that plaintiff's ability to work would be impacted "most

notably" by "his very low pace of function in terms of movement

as well as thought and speech."  Id.(emphasis added).  This

language, included in Dr. Bean's report and specifically quoted

by the ALJ, supports the ALJ's finding that Dr. Bean's opinion

was influenced by Dr. Bean's acceptance of plaintiff's

exaggerated behavior.

Although not as striking in its impact or as explicitly

relied upon by the ALJ, Dr. Bean's second report also supports

the ALJ's finding.  As the ALJ noted, Dr. Bean stated that

plaintiff "walks slowly with a shuffling gait and in a slightly

stooped-forward fashion, appearing very much like a little old

man as he enters the office."  (R. 874)(quoting Ex. 56F (R.

1579)).  Although not quoted by the ALJ, Dr. Bean also reported

that plaintiff "speaks in a very slow fashion . . . His indirect

answers take a long time for him to produce.  Also, there is a

shaky or tremulous quality to his speech.  He speaks in a

monotone fashion."  (R. 1579).  In presenting his opinion

regarding plaintiff's ability to work, Dr. Bean stated "As he

presents himself today, . . . Mr. Spruk continues to demonstrate

-19-

issues which would create difficulty for him in competitive employment.  He functions with very slow pace <u>in terms of movement as well as thought and speech</u>."  (R. 1581)(emphasis added).  Again, the very language of Dr. Bean's report indicates, as the ALJ found, that Dr. Bean's opinion has been influenced by his acceptance of plaintiff's behavior.

As the Commissioner's decision makes clear, when considered in all the circumstances of this case, including Dr. Swearngin's treating source statements and opinions regarding plaintiff's exaggerated behavior and playing for sympathy, the inconsistencies between plaintiff's presentation to different examiners at different times, the consistencies between Dr. Swearngin's opinion and that of the Bert Nash psychologist, and the ALJ's uncontested finding of incredibility, substantial evidence supports the ALJ's decision to reject the opinions of the non-treating source, Dr. Bean.

In his final argument (Pl. Br. 11-12), plaintiff recognizes a recent case, <u>Boucher v. Astrue</u>, in which Judge Marten distinguished the rule in <u>McGoffin</u>, noting that "the court in <u>McGoffin</u> was addressing a case of outright rejection of a medical report, based only on rank speculation as to its authorship," whereas in <u>Boucher</u>, "the ALJ conducted a proper credibility analysis and reached a permissible conclusion that the claimant was less than fully credible.  It was not error for the ALJ to

then use this conclusion as one factor among several in reaching a secondary finding that Dr. Kass's opinion should be given less than controlling weight." Boucher, 2009 WL 737156 at *5.

Plaintiff's argument fails for at least three reasons. First, and most importantly, this court has applied rather than distinguished the rule in McGoffin, Langley, Victory, Robinson, and Smith. Second, this court determined the ALJ's credibility analysis here was uncontested and this court identified at least five reasons in addition to the credibility analysis that the ALJ relied upon in rejecting Dr. Bean's opinion. And, third, Dr. Bean is a non-treating source whose opinion may never be accorded controlling weight, and the Boucher opinion applies by its terms only to a determination whether a treating source opinion is worthy of controlling weight.

Plaintiff has illuminated no error in the decision at issue here.

**IT IS THEREFORE RECOMMENDED** that judgment be entered in accordance with the fourth sentence of 42 U.S.C. § 405(g), AFFIRMING the Commissioner's exceptionally thorough and well-written opinion.

Copies of this recommendation and report shall be delivered to counsel of record for the parties. Pursuant to 28 U.S.C. § 636(b)(1), Fed. R. Civ. P. 72(b), and D. Kan. Rule 72.1.4, the parties may serve and file written objections to this

recommendation within fourteen days after being served with a copy. Failure to timely file objections with the court will be deemed a waiver of appellate review. <u>Morales-Fernandez v. INS</u>, 418 F.3d 1116, 1119 (10th Cir. 2005).

Dated this <u>14th</u> day of June 2010, at Wichita, Kansas.


<u>s:/   Gerald B. Cohn   </u>
**GERALD B. COHN**
**United States Magistrate Judge**